**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **NICHOLAS BRACCIA and** | : | **CIVIL ACTION** |
| **KAREN (REISS) BRACCIA, H/W,** | : | |
| Plaintiffs, | : | |
| | : | |
| **vs.** | : | |
| | : | **NO. 08-1370** |
| **ARLINGTON CAPITAL MORTGAGE** | : | |
| **CORPORATION and MARK PONTZ,** | : | |
| Defendants. | : | |

DuBOIS, J.                                                    November 9th, 2009

## <u>MEMORANDUM</u>

This is a tort action brought by Nicholas J. Braccia and Karen C. Braccia (hereinafter referred to collectively as "the Braccias") against Arlington Capital Mortgage Corporation (hereinafter "Arlington") and its employee, Mark Pontz (hereinafter "Mr. Pontz") seeking damages for allegedly negligent misrepresentations made by Pontz during the Braccias' application for a mortgage loan from Arlington.

A bench trial was held on October 20, 2009. After considering the testimony of the witnesses, the exhibits received in evidence, and the arguments of counsel, the Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a):

## I. FINDINGS OF FACT

1. On February 17, 2007, Ms. Braccia (nee Reiss) entered into an Agreement of Sale to sell her real property located at 344 Sherry Lane, Coatsville, PA (the "Old House"). (Stipulation of Uncontested Facts (hereinafter "St.") ¶ 1); (Trial Ex. D-13).

2. Settlement on the Old House was scheduled for April 3, 2007. (St. ¶2); (Trial Ex. D-13).

3. On February 18, 2007, the Braccias entered into an Agreement of Sale to purchase the real property located at 3 Kristen Drive, Coatsville, Chester County, PA (the "New House"). (St. ¶ 3); (Trial Ex. D-14).

4. The Agreement of Sale contained a mortgage contingency clause allowing the Braccias to cancel their purchase of the New House if they could not secure a commitment for a thirty-year conventional mortgage in the amount of $314,000 with an interest rate of between 6% and 7%. If the seller did not receive a copy of the Braccia's mortgage commitment by March 15, 2007, it was agreed that the mortgage commitment date would be extended unless the seller terminated the Agreement of Sale by written notice. (St. ¶ 4); (Trial Ex. D-13).

5. The closing on the New House was scheduled for March 23, 2007. (St. ¶ 5); (Trial Ex. D-14).

6. Ms. Braccia called Arlington in mid-February 2007 seeking a mortgage to finance the purchase of the New House. (Transcript of Non-Jury Trial Before the Honorable Jan E. DuBois, 39 (Oct. 20, 2009) (hereinafter "Tr.")); (Trial Exs. P-2(a), P-2(b)).

7. The Court finds that at all times material to this action, Arlington was a mortgage broker and mortgage banker engaged in the business of underwriting, marketing and selling mortgages to clients seeking to finance the purchase of homes.

8. Ms. Braccia spoke with Mr. Pontz, a branch manager and employee of Arlington. The two discussed the Braccias' financing needs and options. (St. ¶ 7); (Tr. 38).

9. Ms. Braccia told Mr. Pontz in their initial telephone conversation that the Braccias could only afford monthly payments in the range of $2,500 to $2,600. (Tr. 39). Mr. Pontz responded that "he was sure [the Braccias] could get into the range with what [the Braccias] wanted." (Tr. 39).

10.  Mr. Pontz was informed at that time that the closing on the New House was scheduled for March 22, 2007.  (St.  ¶ 8).

11.  During this initial discussion, the Braccias and Mr. Pontz discussed a loan product known as the "Smart Loan."  (St. ¶ 9).

12.  A Smart Loan is a loan that allows its recipient to make interest-only payments for a set number of years.  At the end of the interest-only period, the remaining amount due on the loan is amortized.  If a Smart Loan recipient voluntarily agrees to make higher payments during the interest-only period, the recipient's payments after the interest-only period are lower than they would have been should the recipient have paid only the interest. (Tr. 42, 124).

13.  Mr. Pontz said he believed that the Braccias would qualify for a conventional mortgage and sent letters to the Braccias' broker, Chris Beebe, on February 13 and February 19,2007,  stating that the Braccias "have excellent credit and are well-qualified to purchase a home priced as we discussed."  (Trial Exs. P-2(a), P-2(b)).

14.  The Braccias applied for the Smart Loan on February 22, 2007, submitting all of the documents Arlington required as part of its mortgage loan application.  (St. ¶ 10); (Trial Ex. D-16); (Tr. 121).

15.  The application signed by the Braccias contained a statement explaining that "[t]he lender cannot guarantee acceptance of a borrower's application into a particular loan program.  The Lender will keep the borrower informed of the progress of the processing of the loan application in the event that problems arise in the processing or underwriting of the loan which may delay closing." (Trial Ex. D-16).

16.  On February 22, 2007, Mr. Pontz provided the Braccias with a Real Estate Settlement

Procedures Act (hereinafeter "RESPA", 12 U.S.C. § 2601 et seq.) Good Faith Estimate of the proposed Smart Loan with a monthly payment of $2,563.32 (hereinafter the "First Estimate").[1] (St. ¶ 11); (Trial Ex. P-1).

17. The First Estimate stated that the information it contained "reflect[s] estimates of the charges you are likely to incur at the settlement of your loan. The Fees listed are estimates – the actual charges may be more or less." (Tr. Ex. P-1).

18. Ms. Braccia testified that she was aware that the numbers provided in the First Estimate were subject to change. (Tr. 83). She further testified that she knew that the First Estimate was not a loan commitment. (Tr. 84). She also knew that she would not know her actual monthly payments until all of the information related to the New House was verified. (Tr. 83).

19. The First Estimate reflected the terms of the Smart Loan. Each monthly payment in that estimate consisted of interest only, with no payment of principal, until the interest-only period of the loan ended. (Trial Ex. P-1); (Tr. 125).

20. The Court finds that neither Arlington nor Mr. Pontz represented that the Braccias would receive the Smart Loan reflected in the First Estimate. At all times, the Braccias knew that their application for a Smart Loan could be denied and that their monthly payments might be higher or lower than the one shown in the First Estimate.

21. To process the Braccias' application for the Smart Loan, Mr. Pontz collected the needed underwriting information from the Braccias and ordered an appraisal of the New House. (St. ¶ 12); (Tr. 123).

---

[1] This monthly payment figure is derived by adding $1,771.32 for interest, $475.00 in Real Estate Taxes, $45 in Flood and Hazard Insurance and $272.91 in Mortgage Insurance. The $1,771.32 was for interest only because it reflected the term of a Smart Loan in which each payment goes towards interest only for a fixed period of years. (Tr. 125, lines 1-10).

22.  The appraisal of the New House was completed on or about March 12, 2007. (St. ¶ 13).

23.  Arlington's underwriters reviewed the Braccias' application for a Smart Loan and placed it in suspense. (Tr. 125).

24.  Mr. Pontz testified that once he was informed of the suspension, he reviewed the conditions of the suspense, determined they could not be overturned, and asked the underwriters to find the best alternative to the Smart Loan.  (Tr. 126).

25.  On March 22, 2007, approximately three hours before the scheduled closing on the Braccias' New House, Mr. Pontz informed the Braccias that underwriters at Arlington had denied their application for a Smart Loan but had approved them for a conventional loan.  (St. ¶ 15).

26.  At that time, Mr. Pontz provided the Braccias with a revised Good Faith Estimate (hereinafter the "Second Estimate") reflecting a $314,000 conventional loan at an interest rate of 6.75% and monthly payments of $2,865.60.[2] (Trial Ex. P-3).

27.  Mr. Pontz told the Braccias that the increase in the estimated monthly payments was due to the fact that they had not qualified for the Smart Loan.  (St. ¶ 17).

28.  The terms of the conventional loan satisfied the mortgage contingency clause in the Agreement of Sale for the New House. (St. ¶ 4); (Trial Exs. P-3, D-13).

29.  Hoping to maintain cordial relations with his clients, Mr. Pontz offered to reduce his broker fee from 1.5% to 0.5% because of the increase in the amount of the monthly payments.  At closing on March 22, 2007, the Braccias paid a fee of only 0.5%, $1,570.00.  (Trial Ex. D-3) (Tr. 75).

30.  The Court finds that Mr. Pontz made a good-faith effort to obtain approval for the

_____

[2] This figure is derived by adding $2,036.60 for interest and principal, $492.83 in Real Estate Taxes, $86.00 in Flood and Hazard Insurance and $251.20 in Mortgage Insurance.  (Trial Ex. P-3).  The $2,036.60 was for both interest and principal because it reflected a conventional loan in which each payment by the recipient is applied to interest and principal.  (Tr. 125).

Braccias on the best terms available according to Arlington's underwriters. It further finds that neither Arlington nor Mr. Pontz delayed in notifying the Braccias of the terms of the mortgage for which they were approved.

31.  The Braccias decided to close on the New House on March 22, 2007 with the conventional loan described in the Second Estimate. (St. ¶ 19).

32.  Ms. Braccia testified that, based on her conversation with Mr. Pontz, when she arrived at the closing on March 22, 2007, she knew that her monthly payments would be $2,865.60. (Tr. 72).

33.  Ms. Braccia testified that the Braccias were willing to close on their new home with the conventional loan reflected in the Second Estimate requiring monthly payments of $2,865.60. (Tr. 72).

34.  The Court finds that the Braccias intended to go forward with their conventional loan despite the fact that its monthly payments of $2,865.60 fell outside the $2,500 to $2,600 monthly payment range they desired.

35.  On March 22, 2007 Mr. Pontz offered to accept another loan application from the Braccias in approximately five months to determine if they might qualify for the Smart Loan at that time. (St. ¶ 18); (Tr. 128).

36.  Ms. Braccia testified that she knew they would have to re-apply for a loan in September 2007 and that there was no guarantee that the Braccias' application would be accepted. (Tr. 75).

37.  The Braccias believed that they had not been approved for the Smart Loan because of a mistake on their credit report. Once the mistake was corrected, Ms. Braccia testified that she "had no reason to believe that we would not get the Smart Loan, and that's what we were – that's what

we were counting on." (Tr. 76). She "felt confident that we would not be turned down after the five or six months because our credit would b healed. And that the problem, the bogus things on our credit. So, yes, I felt that would get the Smart Loan, which is what we wanted." (Tr. 88).

38. The Court finds the testimony of both Mr. Pontz and Ms. Braccia credible. It concludes that Mr. Pontz did not guarantee refinancing and that Ms. Braccia, although confident of her chances of qualifying, did not believe he had guaranteed that the Braccias would obtain a Smart Loan.

39. The First Estimate shown to the Braccias assessed a yearly school tax of $5,700. (Trial Ex. P-1).

40. The Second Estimate, shown to the Braccias three hours before the settlement and signed by the Braccias at the settlement, assessed a yearly school tax of $5,913.96. (Trial Ex. P-3).

41. Ms. Braccia's testimony reveals that she understood that the school tax on the New House would be between $5,700 and $5,913.96 per year. (Tr. 70).

42. The Court finds that all times material to this matter prior to the closing settlement, the Braccias understood that their yearly school tax on the New House would be between $5,700 and $5,913.96. It further finds that, prior to the closing, no one at Arlington had ever stated that the Braccias' school tax would be less than $5,700.

43. At the closing on March 22, 2007, the Braccias received a document entitled "Initial Escrow Account Statement" (hereinafter the "Escrow Statement"). (Trial Ex. P-4) (Tr. 52).

44. The Escrow Statement described anticipated transactions in the escrow account set up to manage the payment of mortgage insurance and local property taxes in accordance with the terms of the mortgage agreement. (Trial Exs. P-4, D-2).

45. The Escrow Statement disclosed that the Braccias' first monthly mortgage payment

would be only $2, 563.21. (Trial Ex. P-4).

46. The Escrow Statement listed a "Payment[] from Escrow Account Amount" of $1,371.36 described as "School Taxes". (Trial Ex. P-4).

47. At the closing, the Braccias also received a form used by the United States Department of Housing and Urban Development entitled "Settlement Statement" (hereinafter "HUD-1 Settlement Statement"). (Trial Ex. P-5).

48. A section of the HUD-1 Settlement Statement described as "Adjustments for Items Paid by Seller in Advance" listed an item labeled "School Taxes 03/22/07 to 06/30/07" on line 108 in the amount of $1,371.39. (Trial Ex. P-5).

49. A separate section of the HUD-1 Settlement Statement described "Reserves Deposited with Lender." (Trial Ex. P-5). Line 1005 in this section listed an item labeled "school taxes." It then described a reserve in the amount of $1,257.08 "Paid from Borrower's Funds at Settlement." The figure in line 1005 was calculated by taking the amount of $114.28 a month and multiplying it by 11 months.[3] Id.

50. Ms. Braccia asked the title agent present at the closing why the monthly payment calculated in the Escrow Statement was lower than the monthly payment in the Second Estimate. The title agent responded that the Braccias' school tax had been overestimated. (Tr. 72).

51. Ms. Braccia testified that "anything that had to do with the taxes at that point in time was not really looked at by me, because we asked what the problem was, and they stated, They [sic] overestimated your taxes." (Tr. 73).

_____

[3] It is unclear why the calculation covered only 11 months. 12 months at $114.28 a month would equal $1,371.36, a figure very close to the $1,371.39 listed in Line 108 of the HUD-1 Settlement statement. No one was questioned about this discrepancy at the trial.

52. The Court finds that the Braccias relied on the statement of the title agent at the closing that their taxes had earlier been overestimated. The Court further finds that the only investigation into the tax discrepancy performed by the Braccias at the closing was to question the title agent. The Braccias did not call Mr. Pontz or anyone at Arlington to clarify the amount of the school tax at the closing.

53. Mr. Pontz testified that he had no role in preparing documents for the closing. (Tr. 128).

54. Mr. Pontz testified that the title agent was not affiliated with Arlington, (Tr. 141), and Ms. Braccia testified that she was aware that the title agent was not from Arlington, (Tr. 72).

55. The Court finds that the title agent was independent of Arlington.

56. Joseph Granaham (hereinafter "Granaham"), an executive vice president at Arlington, testified that he reviewed the Braccias' closing documents with the manager of Arlington's post closing department and determined that the title company provided Arlington with an initial HUD-1 Settlement Statement that calculated the school tax from March 22, 2007 to June 30, 2007 as $1,371.39 (Tr. 159).

57. Granaham further testified that Arlington's closing department accidentally used the $1,371.39 figure - a figure representing only the school tax from March 22, 2007 to June 30, 2007 – as the yearly tax figure in the closing instructions Arlington provided to the title company. (Tr. 157).

58. When Arlington mistakenly used $1,371.39 as the annual school tax in its closing instructions the title company used this figure in the Escrow Statement it provided at the closing settlement. (Tr. 156).

59. The Court finds Granaham's testimony credible. It further finds that the erroneous tax

figure used in the Escrow Statement was the result of a mistake at Arlington's closing office involving the substitution of a figure representing approximately three-months' school tax – 1,371.39 – for the yearly school tax – $5,913.96. This mistake led to the erroneous $2,563.21 monthly payment figured in the Escrow Statement.

60.  Ms. Braccia testified that the Braccias paid $2,563.21 each month for ten months after the closing, until February 2008. (Tr. 53).

61.  Based on Ms. Braccia's testimony, the Court finds that the Braccias paid the amount shown in the Escrow Statement – $2,563.21 – each month from the time of their closing until February 2008. (Tr. 53).

62.  Ms. Braccia testified that she and Nicholas were informed by GMAC, the holder of their mortgage, in February 2008, that they were $6,000 in arrears on their taxes. GMAC also informed Ms. Braccia that even after they paid the arrears, the Braccias' monthly payments would be approximately $2,800. (Tr. 61).

63.  In early September 2007, Ms. Braccia and Mr. Pontz began an e-mail correspondence in anticipation of re-applying for the Smart Loan. (St. ¶ 21).

64.  On September 7, 2007, Ms. Braccia wrote, in part: "OK, only thing I really need to mention is that I do not want our payment to go any higher. Nick and I have agreed that if we have to pay more (depending on the amount) then we aren't going to go through with it, and I want you to know that up front. We will sit on it until things are better." (St. ¶ 22); (Trial Ex. D-20)

65.  In response, Mr. Pontz wrote, in part: "Of course I would not want you to do anything unless it improved your circumstances." (St. ¶ 23); (Trial Ex. D-20).

66.  In mid-September 2007, Ms. Braccia faxed financial information to Mr. Pontz so that

the Braccias could again apply for a Smart Loan. On her fax cover sheet Ms. Braccia wrote : "Let me know if know if there is anything else you need. Hope to hear from you soon – with good news!" Ms. Braccia then drew a smiley face and signed her name. (St. ¶ 25); (Trial Ex. D-19).

67. The Braccias did not receive a Smart Loan in September 2007 because Arlington's underwriters once again concluded that they did not qualify for the program. (St. ¶¶ 25, 26).

68. Ms. Braccia's "best guess" as to why the Braccias were not approved for a Smart Loan in September is that "the housing market had fallen by then, and it was getting harder and harder to sell homes, the rates were going down, and I imagine that means maybe my home wasn't worth what it was worth five month's prior." (Tr. 67-68).

69. Ms. Braccia sent Mr. Pontz an e-mail on January 18, 2008 to inquire about reapplying for the Smart Loan. (Trial Ex. D-21 at 49).

70. In response to their January inquiry into the availability of the Smart Loan, the Braccias were told that the Smart Loan was no longer being offered. (Tr. 68).

71. After receiving the February 2008 notice from GMAC, Ms. Braccia testified that she called Mr. Pontz, who explained that the Escrow Statement had understated the Braccias' school tax. (Tr. 64).

72. Mr. Pontz testified that he was unaware that the Braccias had been paying only $2,563.21 a month on their mortgage until he received Ms. Braccia's call in February 2008. (Tr. 150).

73. The Court finds that there was no testimony from the plaintiffs on the issue of damages. When this was called to the attention of the plaintiffs' attorney at trial, he explained the calculation performed in his proposed findings of fact and conclusions of law: first, find the difference between the monthly payments in the Smart Loan as reflected in the First Estimate and the monthly payments

in the actual loan as reflected in the Second Estimate ($320.28), second, multiply the monthly difference by twelve to get a yearly difference ($3,627.36), finally, multiply the yearly difference by the thirty-year life of the loan to get a total difference of $108,820.80 over the life of the loan. (Tr. 111). Adding pre-paid finance charges of $3,324.80 and the school tax shortage in the escrow account, $2,586.00, produces a final sum of $113,992.80. Counsel did not explain how he arrived at the $2,586.00 escrow shortage figure or why the Braccias were injured in this amount.

74. Contrary to the statements of plaintiffs' counsel, Ms. Braccia's testimony shows that, should the Braccias have received the Smart Loan, they intended to pay an additional $100 to $200 each month over any required monthly payment in their desired range of $2,500 to $2,600. The Braccias intended to pay this additional amount in order to reduce their monthly payments after the ten-year interest-only payment period expired. (Tr. 42, 79).

75. The Court finds that, at all times material to this case, the Braccias wanted the Smart Loan so that they could make monthly payments of $100 to $200 more than the required monthly payment of $2,500 to $2,600, with total monthly payments of between $2,600 and $2,800.

## II. DISCUSSION

The Court discusses the evidence in this part of the Memorandum and incorporates its conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### A. Jurisdiction

28 U.S.C. § 1331 gives this Court the authority to exercise original jurisdiction over cases "arising under" federal law. The Braccias' original Complaint asserted a cause of action arising under the federal Truth in Lending Act, 16 U.S.C. §§ 1601 et seq. (Complaint ¶¶ 25-30). When the Court has original jurisdiction over any claim in a plaintiff's complaint, it may exercise supplemental

jurisdiction over pendent state-law claims. 28 U.S.C. § 1367(a). Although the Braccias withdrew their federal cause of action after filing their Complaint, this Court has supplemental jurisdiction over their state law claims, pursuant to §1367(a). See New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc., 101 F.3d 1492, 1505-07 (3d Cir. 1996) ("Once a court has decided to exercise jurisdiction over the state claim, however, elimination of the federal claim does not deprive the court of the constitutional power to adjudicate the pendent claim.") (citations omitted).

### B. Negligent Misrepresentation

The Braccias' Complaint claims (1) that Arlington, through Mr. Pontz, misrepresented that the Braccias would receive a Smart Loan approximately five months after the closing on the New House, (2) that Arlington and Mr. Pontz should have known that the Braccias would not receive a Smart Loan, (3) that Arlington and Mr. Pontz made the misrepresentations in order to induce the Braccias into accepting the conventional mortgage, (4) that the Braccias relied on the misrepresentation when they accepted the conventional mortgage, and (5) that the misrepresentation cost the Braccias tens of thousands of dollars more than they would have paid over the course of a thirty-year mortgage. (Complaint ¶¶ 39-44).

At trial, counsel for the Braccias changed course, arguing that the misrepresentation was not a promise by Mr. Pontz that the Braccias would receive a Smart Loan but was instead a promise by Mr. Pontz that the Braccias would receive a loan with monthly payments in the $2,500 to $2,600 range. (Tr. 16, lines 20-25) (Plaintiffs' Opening Statement); (Tr. 173, lines 3-19) (Plaintiffs' Closing Argument) . Although this theory was not pled in the Complaint, the Court finds that allowing it to proceed resulted in no prejudice to the defendants because the argument relied on the same facts as the theory actually pled in the complaint. Cf. Fed. R. Civ. P. 15(b) (authorizing courts to permit the

free amendment of pleadings during trial "when doing so will aid in presenting the merits and the objecting party fails to satisfy to the court that the evidence would prejudice the party's action or defense on the merits"). As the Supreme Court has recognized, "[t]he Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." U.S. v. Hougham, 364 U.S. 310, 317 (1960) (citing Conley v. Gibson, 355 U.S. 41 (1957), *abrogated on other grounds by* Bell Atlantic Co. v. Twombly, 550 U.S. 544 (2007)). The Court will therefore address both theories of the case.

To establish a claim of negligent misrepresentation under Pennsylvania law, a plaintiff must show, by a preponderance of the evidence, (1) that the defendant supplied false information in the course of its business or transaction, (2) that the information was provided in order to guide others in the business transaction, (3) that the information was justifiably relied upon by the plaintiffs, (4) that reliance on the information resulted in a loss and (5) that the defendant failed to utilize reasonable care when obtaining or communicating the information. Moffat Enters., Inc. v. Borden Inc., 807 F.2d 1169, 1174 (3d Cir. 1986) (citing Mill-Mar, Inc. v. Statham, 420 A.2d 548, 550 (Pa. Super. Ct. 1980)). A mortgage broker has a fiduciary relationship with its clients, Comm. ex rel. Corbett v. Snyder, 977 A.2d 28, 47-48 (Pa. Commw. Ct. 2009), which gives rise to a legal duty. Although the Pennsylvania Supreme Court has not specifically addressed the appropriate standard of care for a mortgage broker in its dealings with clients, it has noted that liability accrues in the analogous relationship between a real-estate broker and its client when the broker "fails to use reasonable care in ascertaining the truth of a representation." Boortz v. Noon, 729 A.2d 555, 562 (Pa. 1999).

There is no dispute that Mr. Pontz provided information to the Braccias in order to help them secure a mortgage. Mr. Pontz and Ms. Braccia both testified that they discussed the Braccias' application for a mortgage loan and that Mr. Pontz provided the Braccias with guidance about how to obtain a mortgage loan. (Findings of Fact (hereinafter Find.) ¶¶ 6, 7, 8) . The dispute in this case focuses on whether a misstatement occurred, whether it was relied upon, and whether the Braccias were injured. The Court concludes that the Braccias have failed to satisfy their burden proof on these elements.

### 1. Misrepresentation and Failure to Use Reasonable Care

The Braccias assert two theories of misrepresentation. The first, pled in the Complaint, is that Mr. Pontz misrepresented to the Braccias that they could refinance their conventional loan with a Smart Loan. The second, asserted at trial, is that Mr. Pontz misrepresented that the Braccias would receive a loan with monthly payments of between $2,500 and $2,600. No matter the theory, the Court concludes that there was no misrepresentation.[4]

As to the first theory, Mr. Pontz testified that he told Ms. Braccia on March 22, 2007 that the Braccias could apply to refinance their conventional mortgage with a Smart Loan in approximately five months. (Find. ¶ 36). There is no evidence that he promised or guaranteed financing on any particular terms. The evidence presented shows, instead, that there was no misrepresentation or misunderstanding about the fact that the Braccias would have to reapply for a Smart Loan. Ms. Braccia knew that the Braccias' loan application would be evaluated by Arlington's underwriters just as it had been the previous March and that it could be either approved or denied. (Find. ¶¶ 20, 36).

---

[4] Because the Court concludes that there was no oral promise or misrepresentation about the terms of any mortgage loan, it is unnecessary to address defendants' pre-trial motion *in limine* to exclude parol evidence of any alleged oral promise or misrepresentation. Accordingly, the Court denies the motion as moot.

For example, in her September 14, 2007 fax to Mr. Pontz, Ms. Braccia expressed hope – not certainty – that she would receive a Smart Loan. (Find ¶ 66) ("Hope to hear from you soon – with good news!").  The evidence presented at trial establishes only that the Braccias were told by Mr. Pontz they could apply for a Smart Loan at a later date. (Find. ¶ 35).  This statement was not a misrepresentation: the Braccias could and did re-apply for a Smart Loan.

The defendants are also correct that there is no evidence that anyone at Arlington knew or should have known that the Braccias would be unlikely to receive a Smart Loan when Mr. Pontz offered to help them re-apply for such a loan in September 2007.  In fact, Mr. Pontz's written statements to the Braccias' broker shows that he believed the couple had "excellent credit." (Find ¶ 13).  Ms. Braccia, too, believe that she and Nicholas had excellent credit and that, once a mistake had been removed from their credit report, the Braccias would qualify for the Smart Loan (Find ¶ 37).  As elsewhere, the Court finds the testimony of both parties credible.  Everyone believed that the Braccias would probably be approved for a Smart Loan in their second application.  As far as the evidentiary record in this case is concerned, no one knew - and no one presented evidence that any of the parties should have known - that the Braccias would not be approved for the Smart Loan.  Rather, Ms. Braccia surmised that the reason she was not able to get a loan in September was that the "housing market had fallen by then and it was getting harder and harder to sell homes." (Find. ¶ 68). The fact that the Braccias were not approved in September, 2007, does not make Mr. Pontz's earlier stated expectations a misrepresentation, especially in the absence of any evidence that a reasonable professional in the same situation should have known that the financial markets would no longer support products like the Smart Loan in 2007.  It simply means that Mr. Pontz's prediction was wrong and that the Braccias' expectations were not satisfied.

The Braccias' second theory of misrepresentation is that Arlington should be held liable because Mr. Pontz misrepresented that the Braccias' monthly payments would be in the range of $2,500 to $2,600. In their version of events, Mr. Pontz misrepresented that their monthly payments would be in this range. Arlington then prepared the First Estimate to induce the Braccias' belief and waited until the day of the closing to surprise the Braccias with a Second Estimate revealing the terms of a much less desirable loan. When Ms. Braccia objected, the Braccias aver that someone at Arlington prepared the Escrow Statement and HUD-1 Settlement Statement using a school tax figure that was only one quarter of the Braccias' actual school tax. When calculated with this erroneous figure, the Escrow Statement showed that the Braccias would be paying $2,563.21 per month, a figure only $0.11 removed from the $2,563.32 a month payment reflected in the First Estimate. They argue that this is too close to be a coincidence: Arlington must have been trying to misrepresent to the Braccias that their payments would be approximately $2,563 a month when, in fact, it knew that the Braccias would actually have to make monthly payments of $2,865.60, as shown in the Second Estimate. (Tr. 179) (Plaintiffs' Closing Argument).

The Braccias' narrative is not supported by a preponderance of the evidence. Several pieces of evidence presented at trial contradict their story. The first is that the Braccias committed to purchasing a home using a $314,000 mortgage, with an interest rate somewhere between six and seven percent, before they had seen the First Estimate. (Finding ¶¶ 3, 4, 16). The Court finds it difficult to believe – as plaintiffs' counsel asserted at trial – that the Braccias fastidiously calculated their affordable monthly housing payment "to the penny", but then locked themselves into a mortgage contingency clause that would possibly impose payments well outside their range. The more likely scenario is that the Braccias were comfortable with the possibility of going forward on

a $314,000 mortgage with an interest rate of up to 7%, but preferred better terms.

Second, there is no evidence that anyone at Arlington was negligent in preparing the First Estimate or that the First Estimate contained a misrepresentation. The Braccias have never claimed that Arlington violated RESPA when it prepared the First and Second Estimates, see Complaint, and they provided no evidence that Arlington was negligent in preparing the estimates. Instead, the Braccias argue that Arlington was negligent for first providing an estimate that fell within their desired monthly payment range and then providing a second estimate well outside of their range only three hours before closing. Although the Court is sympathetic to the difficulties imposed by such a tight time frame, the Braccias have failed to show that Arlington made a misrepresentation.[5] The First Estimate states clearly that it is just what it claims to be: an estimate that might increase or decrease as more information about the transaction was discovered. (Find. ¶17). More important, Ms. Braccia testified that she knew that the First Estimate reflected the terms of a Smart Loan, which she knew she was not guaranteed. (Find. ¶¶ 18, 20).

The best candidate for a negligent misrepresentation is the estimate in the Escrow Statement that the first monthly payment would be $2,563.21. The evidence shows that Arlington made a mistake: its closing department gave the title agent closing instructions that led them to place only $1,371.39 in escrow when it should have placed more. (Find. ¶¶ 56-69). The question is whether this mistake rises to the level of a negligent misrepresentation. The Court concludes that there is no evidence that it does. Instead, the evidence shows that it was the title agent, not anyone at Arlington,

---

[5] The Court notes that this tight time frame was caused, at least in part, by the Braccias. They signed the Agreement of Sale on February 18, 2007. The evidence establishes that they first spoke with Mr. Pontz only a few days before this date. Because the Agreement of Sale set a closing date of March 22, 2007, the Braccias gave themselves only a little more than a month to secure the terms of a mortgage.

who represented that the Escrow Statement was correct. (Find. ¶ 50).

The evidence demonstrates that Arlington represented the terms of the potential mortgage accurately with Ms. Braccia in their direct communications. The Second Estimate, prepared by Arlington and signed by Ms. Braccia at the closing correctly states that the Braccias' school tax would be $5,913.96 per year. (Find. ¶¶ 42 - 44). The HUD-1 Settlement Statement, also signed by the Braccias at the closing, clearly described the $1,371.39 figure as the taxes due only from the period between March 22, 2007 and June 30, 2007. Ms. Braccia testified that, after speaking with Mr. Pontz, she knew the Second Estimate calculated a mortgage with monthly payments of $2,865.60 per year. (Find. ¶ 33, 34). She also testified that she was prepared to close on her New House with the mortgage reflected in this second estimate. (Find. ¶ 35).

The title agent – not anyone from Arlington – created the confusion in this case by telling the Braccias that Arlington had overestimated the annual school tax. (Find. ¶ 50). Although the title agent relied on information provided by Arlington to prepare the Escrow Statement, there is no evidence that the information provided by Arlington amounted to a misrepresentation. To the contrary, it was an admitted mistake. (Find. ¶ 57, 58). Ms. Braccia decided to accept the title agent's statement despite the fact that Mr. Pontz and the Second Estimate represented that the Braccias' monthly mortgage payments would be $2,865.60 a month and the fact that the HUD-1 described the $1,371.39 figure as school taxes for only a three-month period. She admitted that she performed no other inquiries. (Find. ¶51, 52). Ms. Braccia accepted what the title agent told her as correct even though it contradicted what she had been told by Arlington. In this circumstance, the Court cannot conclude that either Arlington or Mr. Pontz made a negligent misrepresentation. The Braccias have failed to prove, by a preponderance of the evidence, that either Mr. Pontz or Arlington made a

negligent misrepresentation.

2. Reliance

Even assuming that Arlington had made a misrepresentation, the Braccias' claim of negligent misrepresentation would still fail because they failed to show any reliance. The Braccias presented five candidate statements as alleged misrepresentations: (1) Statements by Mr. Pontz that the Braccias' monthly payments would be between $2,500 and $2,600 (2) Mr. Pontz's offer to help the Braccias apply for a Smart Loan in September 2007, (3) the First Estimate, (4) the Escrow Statement and (5) the HUD-1 Settlement Statement. There is no evidence that the Braccias relied on any of these when they agreed to take a conventional mortgage with monthly payments of $2,865.60 on the day of the closing.

Ms. Braccia's testimony establishes that the Braccias did not and could not justifiably rely on any of the statements described above. She testified that she knew the First Estimate was not a guarantee that the Braccias' monthly payment would be $2,563.32. (Find. ¶¶ 18, 20). She also testified that she knew there was no guarantee the Braccias would qualify for a Smart Loan in September, 2007. (Find ¶¶ 36, 38). Finally, Ms. Braccia stated that she knew on the day of the closing that her mortgage would require monthly payments of $2865.60 and that, despite these high payments, she was still willing to go forward with the mortgage. (Find. ¶¶ 33, 34). Ms. Braccia's testimony establishes that the Braccias did not rely on any representation that their payments would be approximately $2,500 per month. The Court concludes that the Braccias have failed to prove, by a preponderance of the evidence, that they relied on any misrepresentation by Mr. Pontz or Arlington.

### 3. Loss

The Braccias' claim of negligent misrepresentation has one final flaw: there is no proof that the Braccias suffered a loss as a result of their reliance on any misrepresentation. At trial and in his trial brief, counsel for the Braccias argued that the couple suffered damages in the amount of $113,992.80. (Fact. ¶ 73). In short, there is no evidence of such damages. Ms. Braccia testified that the Braccias wanted a Smart Loan because they planned to pay a monthly amount greater than the $2,563.32 provided in the First Estimate. (Find ¶ 74). She repeatedly said that they wanted to pay more than their stated monthly payment – at least $100 to $200 more than the $2,500 to $2,600 per month they wanted to pay on the mortgage – so that they could avoid higher payments when the Smart Loan was amortized at the end of the interest-only period. (Find. ¶ 74). Indeed, this was the stated reason for her decision to re-apply for a Smart Loan in September 2007 despite the fact that she was only paying the $2,563.21 as set forth in the Escrow statement (Find. ¶ 74). Assuming that the Braccias carried out these intentions, their maximum monthly payments would have been approximately $2,800 per month: an amount remarkably close to the payment reflected in the Second Estimate. Although there is no requirement that the Braccias establish their damages with absolute certainty, Stone v. C.I.T. Corporation, 184 A. 674, 678 (Pa. Super. Ct. 1936), they must show, by a preponderance of the evidence, that they sustained an injury. Based on the record before the Court in this case, the Braccias have not met that burden.

## II.  The Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL)

As with their negligent misrepresentation claim, the Braccias presented two theories as to how Arlington and Mr. Pontz might be liable under the UTPCPL. The first, pled in the Complaint,

is that Arlington and Mr. Pontz misrepresented that the Braccias would receive a Smart Loan in September 2007. (Complaint ¶ 47). The second, presented at trial, is that Arlington and Mr. Pontz misrepresented that the Braccias have to make monthly payments in the $2,500 to $2,600 range. The Court will address both of these theories.

Pennsylvania's Unfair Trade Practices and Consumer Protection Law (UTPCPL) makes it unlawful for individuals or businesses to engage in unfair or deceptive acts or practices. 73 Pa. Cons.Stat. § 201-3. The purpose of the UTPCPL is to ensure fairness in market transactions and to place sellers and consumers on equal ground. Com. v. Monumental Properties, Inc., 329 A.2d 812, 816 (Pa. 1974); see also Gilmour v. Bohmueller, 2005 WL 241181, No. Civ.A. 04-2535, at *11 (E.D. Pa. Jan.1, 2005). The statute is to be liberally interpreted in order to effectuate its purpose. Monumental Properties, 329 A.2d at 816.

Under the statute, "unfair or deceptive acts or practices" consists of a variety of actions, but the Braccias allege that Arlington engaged in only one: conduct "causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services." 73 Pa. Cons.Stat. § 201-2(4)(ii). In addition to this conduct, the Braccias must prove that they (1) justifiably relied on this conduct and (2) were harmed by it. Toy v. Metropolitan Life Ins. Co., 863 A.2d 1, 10 (Pa. Super. Ct. 2004).

The Braccias claim under the UTPCPL must fail for the same reasons as their negligent misrepresentation claim: even if there was conduct causing a likelihood of confusion, there is no evidence that the Braccias relied on that conduct or that they were injured by it. The Braccias have not proved their UTPCPL claim by a preponderance of the evidence.[6]

---

[6] Because the Court concludes that the Braccias have not satisfied the lower burden imposed by the preponderance of the evidence standard it need not rule on the dispute between

## IV. CONCLUSION

A successful claim of negligent misrepresentation requires a proof that the defendant made a negligent misrepresentation. The Braccias failed to prove that Arlington or Mr. Pontz ever misrepresented either the availability of the Smart Loan or the Braccias' likely monthly payments. Further, both their negligent misrepresentation claim and their claim under the UTPCPL require proof of reliance and injury. The Braccias failed to prove either of those elements of their claims. For all of the reasons stated above, the Court finds in favor of the defendants. An appropriate order follows.

---

the parties over whether UPTCPL claims are governed by the higher standard of clear and convincing evidence.